**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**AT KANSAS CITY**

| | | |
|---|---|---|
| **JORDAN FLAUDING,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.** |
| | ) | |
| **TFI FAMILY SERVICES, INC.,** | ) | |
| | ) | **REQUEST FOR JURY TRIAL** |
| **Defendant.** | ) | |
| | ) | |

Serve:
TFI Family Services, Inc.
618 Commercial Street
Emporia, Kansas 66801

## COMPLAINT

COMES NOW Plaintiff, Jordan Flauding, by and through undersigned counsel, and for her claims against Defendant TFI Family Services, Inc. ("Defendant"), states as follows:

1.  Plaintiff is a female and a resident of the State of Kansas.

2.  Defendant is a corporation, organized under the laws of Kansas with its principal place of business in Emporia, Kansas.

3.  This case involves three torts.

    a.  *Quid pro quo* sexual harassment, including hostile work environment, in violation of Title VII of the Civil Rights Act;

    b.  Retaliation for opposing conduct prohibited by Title VII of the Civil Rights Act, in violation of the same; and

    c.  Discrimination in employment based on disability, in violation of the Americans with Disabilities Act.

4.  Plaintiff worked for Defendant in Kansas.

1

5.      Plaintiff was subjected to a hostile work environment while working at TFI, including *quid pro quo* sexual harassment.

6.      Plaintiff made a complaint about this behavior to Human Resources.

7.      Defendant took adverse actions against Plaintiff, including issuing unfounded disciplinary actions against her, ostracizing her, and otherwise interfering with her ability to do her job.

8.      Plaintiff was also subjected to discrimination based upon her disability.

9.      Plaintiff utilized a reasonable accommodation of a short leave of absence.

10.     Plaintiff was subsequently discharged for using the reasonable accommodation.

11.     Defendant works in an industry affecting interstate commerce, in that Defendant provides services to children and families in states throughout the country.

12.     Defendant employed more than 15 employees in 2020 and does so currently.

13.     Thus, Defendant is an "employer" within the meaning of the Civil Rights Act, pursuant to 42 U.S.C. § 2000e(a)-(b) and the Americans with Disabilities Act as Amended, 42 U.S.C. § 12101 *et seq.*

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as each of the Counts in Plaintiff's Complaint arise under the laws of the United States, specifically Title VII of the Civil Rights Act and the Americans with Disabilities Act as Amended.

## FACTS COMMON TO ALL COUNTS

15.     Plaintiff was hired to work at TFI in November 2019.

16.     Plaintiff was hired to work as a case manager.

17.     Plaintiff had been invited to apply for the position by Jamie Tyler ("Tyler").

18.     Plaintiff had worked with Tyler in the past, and the two had a good working relationship.

19.     Tyler informed Plaintiff of the available position with Defendant, and Plaintiff applied.

20.     Plaintiff began working for Defendant, with Tyler as her superior.

21.     Around November 26, 2019, Tyler and her husband, Eric, sent Plaintiff a picture of a package of Jordan almonds, captioning it "Cute Jordan."

22.     Plaintiff did not like receiving this message and found it odd.

23.     Following this, Tyler and Eric would continue to refer to Plaintiff as "Cute Jordan."

24.     Because Tyler was Plaintiff's boss, Plaintiff tried to ignore the comments.

25.     Shortly thereafter, Tyler began discussing her marital life more frequently with Plaintiff.

26.     On one instance, Tyler asked Eric to come to the office to hang a decoration for Plaintiff.

27.     Tyler asked Eric to come a different day, but he refused.

28.     Tyler told Plaintiff that her response to Eric was, "Well, you would come in then if Cute Jordan wanted you to."

29.     In February 2020, Plaintiff was in Tyler's office, along with two coworkers.

30.     Tyler closed the door to the office.

31.     One of Plaintiff's coworkers told Plaintiff that the group wanted to ask her something.

32.     The coworker said, "I just have to ask, are your boobs real?"

33.     This question made Plaintiff extremely uncomfortable and embarrassed.

34.     Plaintiff looked to Tyler, as her superior, hoping Tyler would dissuade this type of conversation.

35.     Tyler did not say anything to the coworker.

36.     Instead, Tyler stared at Plaintiff and waited for her response to the question.

37.     Embarrassed, Plaintiff quietly replied, "yes."

38.     The women giggled and commented that Plaintiff's breasts were "impressive" and "perky."

39.     Tyler then told Plaintiff that she wished her breasts looked like Plaintiff's.

40.     Plaintiff continued to feel extremely uncomfortable and embarrassed.

41.     Plaintiff left Tyler's office.

42.     In late February 2020, Tyler and Plaintiff were carpooling to court in Linn County, Kansas.

43.     On the drive back to the office, Tyler began discussing her marriage with Plaintiff.

44.     Specifically, Tyler was discussing her sex life with Eric.

45.     Tyler told Plaintiff that Eric had sex with their neighbor.

46.     Tyler described how the neighbor's marriage had been ruined by the affair, and the couple had moved away as a result.

47.     Tyler told Plaintiff that her marriage was not affected.

48.     Tyler then asked Plaintiff if she wanted to know why her marriage was unaffected by this.

49.     Plaintiff did not respond.

50.     Tyler told Plaintiff "I have never told anyone—not even my best friend—what I'm about to share with you."

51.     To this, again, Plaintiff said nothing.

52.     Plaintiff wished for the conversation to be over.

53.     Plaintiff could not escape the conversation because she was in the car with Tyler.

54.     Tyler told Plaintiff that she had undergone a hysterectomy and can no longer "fulfill" her husband's sexual needs.

55.     Because of this, Tyler told Plaintiff that Tyler allows Eric to get his "needs met elsewhere."

56.     Tyler continued to explain to Plaintiff that she had to "approve" of who Eric had sexual relations with and know when it was happening.

57.     Tyler then stated that one of the women who the couple had "chosen" was one of Eric's subordinates.

58.     Tyler told Plaintiff that because Eric was her boss, they weren't worried about her "causing problems."

59.     Plaintiff understood Tyler's conversation to be an invitation for her to participate in this type of relationship with Eric.

60.     Plaintiff also understood Tyler's comment about leveraging a subordinate to be a warning against Plaintiff making any complaint about Tyler's behavior.

61.     Plaintiff replied, "I am sorry it is like this for you."

62.     Plaintiff then immediately changed the conversation to work as they completed the drive back to the office.

63.     Shortly after this encounter, Defendant instructed its staff to work from home due to the outbreak of COVID-19.

64.     Plaintiff was relieved to be away from Tyler.

65.     After a few weeks of working remotely, Plaintiff was on a call with Tyler.

66.     Tyler mentioned that Eric had driven through Frontenac, Kansas on his way to Carthage, Missouri.

67.     Plaintiff lives in Frontenac, Kansas.

68.     Tyler mentioned that she should have told Eric to stop by Plaintiff's house and bring her a coffee.

69.     Plaintiff found this strange but did her best to laugh it off.

70.     Plaintiff and Tyler then ended the call.

71.     After ending the call, Plaintiff realized that she wasn't sure she had ever told Tyler that she lived in Frontenac.

72.     This worried Plaintiff, but she thought it best not to bring it up with Tyler, instead hoping that Plaintiff's residence would not come up in conversation again.

73.     In May 2020, Tyler made additional troubling comments to Plaintiff.

74.     Plaintiff decided to spend some time in Kansas City while working remotely.

75.     This did not affect Plaintiff's job duties, so she decided not to inform Tyler that Plaintiff was staying in Kansas City, rather than at home in Frontenac.

76.     While in Kansas City, Plaintiff and Tyler were on a call for work.

77.     Before the call ended, Tyler asked Plaintiff where she had been the past few days.

78.     Plaintiff was caught off guard by this because she had deliberately not mentioned being away from home to Tyler.

6

79.     After all that has happened, Plaintiff did not want to share the personal details of her life with Tyler.

80.     Plaintiff asked Tyler why Tyler was asking.

81.     Tyler told Plaintiff that ***Eric had driven past Plaintiff's house a couple of times*** and had not seen her car there.

82.     Plaintiff was shocked and upset that Tyler and Eric knew her exact address.

83.     Plaintiff may have mentioned living in Frontenac before, but she never once provided her home address to Tyler.

84.     Plaintiff realized that Tyler must have obtained this information from documents at work.

85.     Plaintiff told Tyler that she was working from Kansas City for a few days.

86.     Tyler replied that she had figured that was what Plaintiff had been doing.

87.     Tyler then ended the call.

88.     After this call, Plaintiff was extremely upset and nervous.

89.     Plaintiff felt uncomfortable knowing that Eric knew where she lived and that he drove by her home multiple times for no reason.

90.     Plaintiff began dreading returning to work and seeing Tyler each day as a result.

91.     Plaintiff continued to work remotely until June 8, 2020.

92.     Following the office's return back to work, Tyler attempted to discuss more personal information with Plaintiff.

93.     Plaintiff began telling Tyler firmly that she did not want to discuss those kinds of personal issues and that she wanted their relationship to be strictly professional.

94.     Tyler was visibly upset by this statement.

95.    Over the next few weeks, however, Tyler continued to attempt to start conversations about her own personal life and Plaintiff's personal life.

96.    Plaintiff was quick to ask Tyler to stop each time.

97.    Each time Plaintiff requested that Tyler not share details of her personal life, Tyler became more upset with Plaintiff's request.

98.    As a result, Tyler began refusing to answer Plaintiff's questions about work.

99.    Plaintiff would then be forced to seek out more experienced case managers for guidance.

100.    This resulted in Plaintiff receiving inconsistent instructions.

101.    Plaintiff was required to submit filings and reports on cases to Tyler within set deadlines.

102.    These documents had to be reviewed and approved by Tyler, and then submitted to the courts.

103.    Plaintiff complied with her assigned deadlines, only for Tyler to hold on to the documents for long periods of time.

104.    This led to Plaintiff being forced to file late reports with the courts as Plaintiff waited on the final, approved documents from Tyler.

105.    Tyler did not exhibit this behavior towards other case managers who had not refused sexual discussions and invitations.

106.    Moreover, Tyler would avoid answering Plaintiff's emails and calls.

107.    Particularly, Tyler would avoid calls regarding impending court-ordered deadlines.

108.    Plaintiff also requested to work overtime to catch up on cases and deadlines.

109.    When Plaintiff asked, Tyler would question whether Plaintiff needed to be working that time and attempt to dissuade Plaintiff from making such requests.

110.    This placed a great strain on Plaintiff's time.

111.    She struggled to cram more and more work into her regular scheduled workweeks.

112.    Following these interactions and changes, Tyler placed Plaintiff on a Corrective Action Plan on July 23, 2020.

113.    Plaintiff was shocked when Tyler presented the document to Plaintiff.

114.    Before this, Plaintiff had never been counseled, corrected, warned, or even talked to about any of the issues Tyler was claiming Plaintiff had at work.

115.    Moreover, several of the issues Tyler identified stemmed from her own behavior due to ostracizing and ignoring Plaintiff after Plaintiff rejected Tyler's sexually charged behaviors.

116.    For example, Tyler noted that Plaintiff had been passing assignments off to her support worker or supervisor.

117.    Plaintiff had only sought out help at the recommendation of Tyler.

118.    Now, Tyler was using this suggestion against Plaintiff.

119.    Tyler also stated that Plaintiff had missed deadlines and was behind on her work.

120.    The referenced deadlines were only missed because Tyler would not return to Plaintiff or approve the documents necessary for filing.

121.    Tyler also noted that Plaintiff missed a visit with an infant in June.

122.    This was true; however, Plaintiff missed the visit because the infant and family had been tested for COVID-19 and were quarantined as a result.

123.    Tyler knew this.

124.    Tyler also noted that Plaintiff needs to better "control [her] emotions" because "[she] had created negative spaces and anxiety for [her] peers."

125.    Plaintiff has not once received a complaint alleging this kind of behavior.

126.    Plaintiff maintains a professional relationship with all of her coworkers.

127.    The only interactions in which Plaintiff was forceful involved Plaintiff telling Tyler that she did not want to discuss Tyler's love life or Eric's desire to have a sexual relationship with Plaintiff.

128.    Tyler also wrote that Plaintiff had allowed her personal life to affect her work.

129.    This is untrue and was extremely painful for Plaintiff to read.

130.    Plaintiff had been experiencing some personal issues with her son.

131.    These issues in no way impacted Plaintiff's work.

132.    Plaintiff attended some therapy sessions in and around Wichita while the office was remote.

133.    These visits did not interrupt Plaintiff's work.

134.    Plaintiff informed Tyler of the visits but requested that Tyler not share the information with anyone.

135.    Moreover, Plaintiff told Tyler that she did not want to discuss the details further because it was very difficult for her and her family.

136.    Tyler mentioned Plaintiff's family issues as a mean-spirited act of retaliation against her.

137.    Shortly after receiving this corrective plan, Plaintiff began experiencing extreme depression and anxiety about going to work.

138.    Plaintiff felt that Tyler was punishing her for rejecting Tyler's solicitation to have sex with her husband.

139.    Plaintiff worried that her job might be in danger.

140.    After seeking help for these issues, Plaintiff was diagnosed with anxiety disorder and depression.

141.    Plaintiff's treatment providers advised to take a leave of absence and address the issues with Human Resources.

142.    Following this advice, Plaintiff requested and received a leave of absence as a reasonable accommodation.

143.    The leave was to last from August 26, 2020, to September 23, 2020.

144.    Plaintiff notified both Tyler and Human Resources of her need for leave on August 25, 2020.

145.    On August 31, 2020, Tyler told Plaintiff that she had spoken with Human Resources and that Plaintiff needed to submit a new note each day she was gone.

146.    Moreover, Tyler told Plaintiff that Plaintiff needed to send those documents directly to Tyler, not Human Resources.

147.    Plaintiff found this instruction to be very odd.

148.    As such, Plaintiff called Human Resources to ask what the proper procedure was.

149.    Human Resources told Plaintiff that she needed just one note completed showing the dates of her leave and that Plaintiff was to send this to Human Resources, not her supervisor.

150.    Plaintiff explained to Tyler what Human Resources had told her.

151.    Tyler never addressed the discrepancy.

152.    Tyler was attempting to set Plaintiff up for failure by not providing these documents for leave to Human Resources.

153.    Plaintiff faxed the documentation to Human Resources that afternoon.

154.    Plaintiff also asked how she could submit a complaint of sexual harassment and retaliation.

155.    Human Resources provided Plaintiff with an email address for submitting such a complaint.

156.    Plaintiff began typing out her complaint.

157.    Plaintiff found this to be extremely difficult because of how much the circumstances upset her.

158.    At her therapist's suggestion, Plaintiff worked on the complaint a little bit each day, so as to not become overwhelmed with reliving the events.

159.    Throughout her leave, Plaintiff maintained contact with Defendant.

160.    Plaintiff maintained this contact to ensure that there were no questions about cases she had been assigned.

161.    For example, Plaintiff had been subpoenaed to appear in court for one case, and she intended to make that appearance despite her leave.

162.    Ultimately, however, the matter was resolved prior to that court date, so Plaintiff did not have to appear.

163.    Plaintiff kept Tyler informed of the status of that case, including Plaintiff's plan to appear in court if needed.

164.    Plaintiff finished her complaint around September 3, 2020.

165.    Plaintiff contacted Shaileen Thompson, the Director of TFI, to schedule a meeting to present her complaint.

166.    Plaintiff believed this would be easier and more efficient than sending an email.

167.    Thompson did not respond to Plaintiff's message for nearly two weeks.

168.    On September 15, 2020, Thompson responded.

169.    Thompson responded, "Have you contacted Jamie about being off?"

170.    Plaintiff was worried by this response.

171.    Plaintiff explained to Thompson that she had told Tyler and provided documentation to Human Resources.

172.    Plaintiff asked Thompson if there were any issues with her leave.

173.    Thompson responded that she would "follow up with HR."

174.    Plaintiff explained in further detail about her leave and provided Thompson with copies of the text messages she had sent to Tyler.

175.    Thompson then asked Plaintiff, "But how do you know what is going on with your PTO?"

176.    Confused, Plaintiff asked what that meant.

177.    Thompson did not directly answer Plaintiff's question.

178.    Plaintiff explained that she was on unpaid leave at that point.

179.    Plaintiff provided her cell phone number at Thompson's request.

180.    Thompson never contacted Plaintiff again about this or any other issue.

181.    Following this interaction, Plaintiff felt very worried.

182.    Plaintiff contacted Human Resources again.

183.    Plaintiff was told that she was still on leave; it was just unpaid.

184.     Plaintiff inquired about short-term-leave payments and was provided with information about those benefits.

185.     On Friday, September 18, 2020, Plaintiff submitted her written complaint about the sexual harassment and retaliation Plaintiff had experienced from Tyler.

186.     Plaintiff submitted this complaint by sending it to the email Human Resources had provided, as Thompson never engaged with Plaintiff's request to meet with her.

187.     Plaintiff identified Tyler by name and provided details about the harassment and retaliation Plaintiff had experienced.

188.     Approximately 60 minutes after submitting the complaint, Plaintiff received a phone call from Tyler.

189.     Tyler informed Plaintiff that she had been discharged from employment.

190.     Plaintiff asked Tyler why she had been discharged.

191.     Tyler refused to tell Plaintiff why she had been discharged.

192.     Tyler asserted that Defendant did not have to give Plaintiff a reason under Kansas law.

193.     Plaintiff asked when she could come pick up her personal belongings.

194.     Plaintiff and Tyler then ended the call.

195.     Following her discharge, Plaintiff applied for unemployment benefits.

196.     Plaintiff was initially denied.

197.     Plaintiff had learned that Defendant had told the Kansas Department of Labor that Plaintiff had abandoned her job.

198.     Specifically, Defendant claimed that Plaintiff "was to return to work on 9/9/20 from approved personal leave and did not return, nor did [Plaintiff] contact supervisor about not returning to work or extending personal leave."

199.     Plaintiff was shocked by this blatant lie.

200.     Plaintiff appealed the determination.

201.     Plaintiff submitted written communications about her leave lasting until September 23, 2020 and communications with both Tyler (Plaintiff's former supervisor) and Thompson (a Human Resources representative).

202.     These communications occurred *after September 9, 2020*—the date upon which Defendant alleged Plaintiff was to return and after which Defendant alleged that Plaintiff never contacted Defendant.

203.     Plaintiff was awarded benefits as a result of her appeal.

204.     On or about April 8, 2021, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Defendant engaged in discriminatory and retaliatory actions that are being raised in this lawsuit, or alternatively, all conduct alleged herein would have arisen from the investigation of such Charge of Discrimination.

205.     A Notice of Right-to-Sue letter dated June 30, 2021 has been issued and this action is being brought within ninety (90) days from the issuance of such Right-to-Sue letter from EEOC.

206.     All actions or inactions of or by Defendant occurred by or through its agents, servants, or employees, acting within the course and scope of their employment, as set forth herein.

## <u>COUNT I - SEX DISCRIMINATION (HOSTILE WORK ENVIRONMENT)</u>
## <u>IN VIOLATION OF THE CIVIL RIGHTS ACT</u>

207.     Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 206 of her Complaint, as though fully stated herein.

208.     Plaintiff is a female.

209.     During her employment with Defendant, Plaintiff was subjected to sexual harassment by Jamie Tyler.

210.     When Plaintiff refused Tyler's sexual advances, she was subject to adverse treatment in response, *e.g. quid pro quo* harassment.

211.     This conduct, by and through a supervisory employee of Defendant, created an intimidating, hostile, and/or offensive work environment.

212.     The motivating factor in this conduct was Plaintiff's sex.

213.     This harassment was not an isolated incident, but a severe and pervasive pattern of hostility that impacted terms, conditions, and privileges of Plaintiff's employment, including but not limited to:

      a.   Making comments about Plaintiff's breasts at work;

      b.   Subjecting Plaintiff to descriptions of her supervisor's sexual relationship with her husband;

      c.   Propositioning Plaintiff to engage in sexual intercourse with her supervisor's husband;

      d.   Providing private information about Plaintiff's personal residence to her supervisor's husband;

      e.   Coming to Plaintiff's home to check if Plaintiff was there;

f.   Encouraging such unwelcomed and uninvited visits by Plaintiff's supervisor's husband;

g.   Interfering with Plaintiff's ability to concentrate during her assigned work; and

h.   Depriving Plaintiff of a workplace free from sex discrimination and sexual harassment.

214.   This discrimination was so severe that it rendered Plaintiff's working conditions objectively intolerable.

215.   As a direct and proximate result of this unlawful conduct, Plaintiff has suffered irreparable injury, including loss of employment opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

216.   Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

217.   Thus, an award of punitive and exemplary damages is appropriate.

218.   Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; for Plaintiff's attorneys' fees; and for all other relief deemed just and proper by this Court.

## COUNT II - RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT

219.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 218 of her Complaint, as though fully stated herein.

220.    Plaintiff made complaints of actions prohibited by the Civil Rights Act.

221.    These complaints were made first to Plaintiff's supervisor.

222.    Plaintiff then made complaints to Defendant's Human Resource department.

223.    Defendant took adverse actions against Plaintiff.

224.    These adverse actions included, but are not limited to:

    a.   Interfering with Plaintiff's ability to do her job;

    b.   Issuing unfounded disciplinary actions against Plaintiff;

    c.   Placing Plaintiff on a Corrective Action Plan;

    d.   Falsifying and exaggerating the justifications for placing Plaintiff on a Corrective Action Plan;

    e.   Referencing Plaintiff's personal family matters after Plaintiff requested that those matters be kept private;

    f.   Discharging Plaintiff from employment;

    g.   Making false justifications for Plaintiff's termination;

    h.   Failing to provide Plaintiff with a meaningful investigation of her complaints; and

    i.   Failing to correct in any way the harassment that Plaintiff had experienced.

225.    The motivating factor in these adverse actions taken by Defendant with respect to Plaintiff's employment was Plaintiff's complaints about activity prohibited by the Civil Rights Act.

226.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including loss of employment benefits, loss of employment

opportunities, emotional pain, suffering, humiliation, inconvenience, mental anguish, and loss of enjoyment of life, and will continue to suffer the same unless and until this Court grants relief.

227.   Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

228.   Thus, an award of punitive and exemplary damages is appropriate.

229.   Plaintiff is also entitled to recover all her costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against Defendant for compensatory damages in an amount exceeding $75,000.00; for punitive damages; for Plaintiff's costs and expenses occurred herein; for Plaintiff's attorneys' fees; and for all other relief deemed just and proper by this Court.

## COUNT III – DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101 *et. seq.*

230.   Plaintiff incorporates by reference the allegations contained in Paragraphs 1 through 229 of her Complaint, as though fully stated herein.

231.   Plaintiff suffered from mental impairments that substantially limited one or more of her major life activities, including but not limited to her ability to work.

232.   Defendant regarded Plaintiff as suffering from a mental impairment and regarded it as limiting Plaintiff from life activities, including the ability to maintain employment.

233.   In reality, Plaintiff was always able to perform the essential job functions of her former position with reasonable accommodations.

234.   Thus, Plaintiff suffered from a "disability" as defined by 42 U.S.C. § 12102(1).

235.    Defendant took adverse employment actions against Plaintiff, including but not limited to discharging Plaintiff from employment for utilizing a reasonable accommodation for her disability.

236.    The motivating factor in these adverse employment actions was Plaintiff's disability.

237.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered irreparable injury, including past and future pecuniary losses, emotional pain, suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, reduced employment opportunities, and will continue to suffer the same unless and until this Court grants relief.

238.    Defendant acted toward Plaintiff with willful conduct, wanton conduct, and/or malice.

239.    Thus, an award of punitive and exemplary damages is appropriate.

240.    Plaintiff is also entitled to recover all of his costs, expenses, expert witness fees, and attorneys' fees incurred in this matter.

WHEREFORE, Plaintiff prays for judgment against the above-named Defendant in an amount in excess of $75,000, for punitive damages, for attorneys' fees, and for such other and further consideration and relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff requests a trial by jury in the United States District Court for the District of Kansas, to be held at the Robert J. Dole Federal Courthouse in Kansas City, Kansas, on all Counts and the allegations of wrongful conduct alleged therein.

Respectfully submitted,


 */s/ Daniel L. Doyle*_____
Daniel L. Doyle, KS Bar No. 11260
Robert A. Bruce, KS Bar No. 28332
DOYLE & ASSOCIATES LLC
748 Ann Avenue
Kansas City, Kansas  66101
Telephone:  (913) 371-1930
Facsimile:  (913) 371-0147
d.doyle@ddoylelaw.com
r.bruce@ddoylelaw.com
ATTORNEYS FOR PLAINTIFF